ROBERT L. CUTTING, Respondent, *v.* WALTER L. CUTTING, Executor, etc., and others, Appellants.

*Beneficial power, what is — What powers are valid — When the appointee of a power holds as trustee for the creditors of the donee — Revised Statutes changes the former rule as to real, but not as to personal estate.*

A power authorizing a person named to appoint, by his last will, a person or persons to whom real estate, belonging to the donor of the power, should be conveyed, is a general beneficial power within section 79 of 1 Revised Statutes, 732.

The word "enumerated," in section 92 of 1 Revised Statutes, 733, providing that "no beneficial power, general or special, hereafter to be created, *other than such as are already enumerated and defined* in this Article, shall be valid," is not to be read literally as limiting beneficial powers to those specifically detailed in the previous sections, but is to be construed as used in the sense of "mentioned," "indicated," "referred to," or "authorized."

The equitable doctrine that where one having a general power of disposition executes it in favor of a purchaser, not for a valuable consideration, and then dies, such purchaser is considered in equity as a trustee for the creditors of the donee of the said power, was abolished by the Revised Statutes as to real estate, but still continues in force as to personal property.

A testatrix, by her will, devised a certain share of her estate to her executors, in trust, to receive the rents, issues and profits thereof, and apply the same to the use of her son Fulton during his life; and, on his death, to convey the capital of such share to such person or persons as he should by his last will appoint, and in default of appointment then to convey the same to other persons as therein prescribed.

Fulton executed the power of appointment by his will, and died insolvent.

*Held*, that the power of appointment conferred by the testatrix upon her son was a valid, beneficial power.

That his exercise of the power of appointment did not have the effect of subjecting the real estate to the claims of his creditors, but did so operate as to the personal estate. (BRADY, J., dissenting, in so far as it was held that the son's creditors were not entitled to enforce their claims against the real estate.)

APPEAL from a judgment entered at Special Term, overruling the demurrers severally interposed by the defendants, and granting the relief prayed for by the complaint, that certain judgments, amounting to over $50,000 recovered by the plaintiff against Fulton Cutting, deceased, in his life-time, be charged upon one of the shares of the estate of Gertrude Cutting, deceased.

By the sixth item of her will, Gertrude Cutting devised and bequeathed a share of her estate to her "executors in trust to receive the rents and profits thereof during the life of my son, Fulton Cutting, if he survive me, and to apply the same to the use of my son, Fulton Cutting, during his life ; and, upon his decease, to assign and convey the capital to such person or persons, and in such manner as he, by his last will and testament (and not otherwise), may direct and appoint," and in default of such appointment she gave "one-half of such capital to each of his sons, Bayard Cutting and Fulton Cutting," to be held by each for life, with remainder to his issue, with provisions for the case of death, without issue and survivorship of these two grandsons. In case of failure of issue of both grandsons, she gave the share to "such of my children as may then be living and unto the issue then living of such of them as may have died leaving issue." And it was her expressed "desire to provide for all contingencies, and not have any of the principal devises or bequests herein contained lapse or fail for want of persons living capable of taking the same under this will."

By the seventh clause of her will the executors were empowered, in their discretion, to convey and transfer any part of this trust share free from further trust or contingency ; but no such transfer is alleged to have been made.

Fulton Cutting having survived the testatrix, his mother, died in 1875, leaving a will and codicil duly executed by him. By

the will the capital of the trust share devised and bequeathed by the sixth item of his mother's will was appointed by him to his brother Walter, upon trust for his two sons, being the two grandsons to whom it was given by such sixth item, and certain powers of advancement to them and of management were conferred upon the trustee. And, by the codicil, he gave and bequeathed to his sister, Anne F. Reubell, " the full and entire interest which I now have or may have in the estate of my deceased mother, Gertrude Cutting."

In April, 1866, the plaintiff recovered against Fulton Cutting two judgments, which he claims to be entitled in equity to have paid out of the trust share of the estate of Gertrude Cutting, " under said wills and codicil, and by reason of the exercise of the power of appointment by said Fulton Cutting."

*C. B. Moore, Clifford D. Hand* and *Samuel Hand,* for the appellants, W. L. Cutting, executor, and Anne F. Reubell.

*Stephen P. Nash,* for the appellants, W. B. and R. F. Cutting.

*Henry H. Anderson,* for the respondent.

BARRETT, J. :

The facts which raise the very interesting question presented by this case are few and simple. Mrs. Gertrude Cutting, who died in the year 1864, devised a certain share of her estate to her executors in trust, to receive the rents, issues and profits thereof, and apply the same to the use of her son, Fulton Cutting, during his life ; the capital of such share, upon the death of Fulton, to be conveyed to such person or persons as he, Fulton, should by his last will (and not otherwise) appoint. In case of failure to appoint, then one-half of the capital of such share was to go to each of Fulton's sons for life, with remainder over to their issue.

Fulton Cutting died in the year 1875 largely insolvent, and the plaintiffs are among his judgment creditors. By his last will he exercised the power of appointment. The plaintiffs thereupon filed this bill, claiming that the exercise of the power operated to render the property liable, as assets, to the demands of Fulton's

creditors, in preference to the claims of his appointee. The latter demurs. As we understand it, the defendants take three positions :

*First.* That the power itself was not beneficial within 1 Revised Statutes, 732, section 79, and that consequently under 1 Revised Statutes, 732, section 73, it was unauthorized and void.

*Second.* That even if beneficial it is prohibited and invalid under 1 Revised Statutes, 733, section 92.

*Third.* That even if beneficial and valid, the exercise of the power does not operate to let in the donees' creditors.

The power in question was, of course, general under section 77 ; that is, it authorized the alienation in fee, by means of a will, of the lands embraced in the power, to any alienee whatever.

We cannot agree to the proposition that this general power was not beneficial within the meaning of section 79. A general power is beneficial, within the definition of this section, when " no person, other than the grantee has, by the terms of its creation, any interest in its execution."

It is contended that a beneficial power cannot be predicated of a disposition of property by will, and not otherwise, for the reason that such disposition cannot, in any just sense, be said to be made by the testator for his own benefit. Where the power is appurtenant to a life estate in the donee, the reason of this contention fails, both under the statute and on principle. The question, however, is not one of actual or direct benefit to the donee. The word " beneficial," as used in section 79, has a technical signification.

In the case of the alienation under a general power, by means of a will, it does not necessarily involve any personal or pecuniary benefit, profit, or advantage to the grantee of the power. Section 84 speaks of a " general *and beneficial* power *to devise* the inheritance." Although no benefit, in a legal sense, results to the donee, it may yet be a " beneficial " power. The cases support this view. In *Freeborn* v. *Wagner* (49 Barb., 43), the power was to the testator's wife to make such testamentary disposition of the property thereinbefore given to her as should seem to her just and proper.

" This power," said Gilbert, J., " is general and beneficial, because it authorizes the alienation by will to any alienee whatever, and no person other than the grantee has, by the terms of

its creation, any interest in its execution." This case was affirmed (4 Keyes), where WOODRUFF, J., at page 35, said : "This power is both general and beneficial."

But more entirely in point and decisive of this question is the case of *Jennings* v. *Conboy* (73 N. Y., 230). The court there held that it was intended by section 79 to make a power beneficial, *both*, when by its terms the donee was solely interested in its execution, *and when it was entirely silent as to the beneficiary.* EARL, J., at page 235, quotes section 79 and comments upon it thus : "The meaning of this section is plain. If by the terms of the creation of the power no other person than the donee has an interest in its execution, then it is beneficial ; or to the same purpose, if the instrument creating the power does not, by its terms, give an interest in its execution to any one else, the donee is the sole beneficiary. It is claimed, however, that this section must be read as if it provided that when, by the terms of the creation of the power, the donee has an interest in its execution and no other person has such interest, then it is beneficial. If this had been the meaning of the section, why were other persons named and such bungling phraseology used ? It would have been much more direct and natural simply to have provided that 'a general or special power is beneficial where the donee thereof is, by the terms of its creation, the sole person interested in its execution.' "

There need be no confusion upon this subject, when the distinction between a beneficial power to appoint by will (under §§ 77 and 79), and an absolute power to dispose of the fee in the life-time of the donee (under §§ 81 to 85) is clearly recognized ; and also, when the definition of a beneficial power is contrasted with that of a power in trust. We have seen that a general power is beneficial, when *no person* other than the grantee has by the terms of its creation any interest in its execution. A general power is in trust when any person or class of persons, other than the grantee of such power, is designated as entitled to the proceeds or any portion of the proceeds, or other benefits to result from the alienation.

It is, however, insisted, that this power, if beneficial, is, for that very reason, invalid under section 92.

That section reads as follows : " No beneficial power, general or special, hereafter to be created, *other than such as are already enumerated and defined* in this Article, shall be valid."

The contention is that the power in question, although defined, is not among those previously enumerated. We hardly know how to treat this novel and somewhat startling proposition. That the power in question is an exceedingly common one cannot be doubted ; of that fact, the records of almost every surrogate's office in the State will afford ample evidence. Questions of importance under similar powers have repeatedly arisen, and have been solemnly determined, without the power itself being challenged. Notably in the case of *Livingston* v. *Murray* (68 N. Y., 485); and see *Magoffen* v. *Patton* (3 Edw. Chy., 65); and *Wright* v. *Tallmadge* (15 N. Y., 307). The title to a vast amount of property rests upon the validity of such powers. It behooves us, therefore, to consider this question with extreme care. Our best judgment, after full and thoughtful consideration is, that these words, " enumerated and defined," are not to be read literally as limiting beneficial powers to the few specially detailed in the previous sections. They might be read disjunctively, if that were necessary to give them the effect intended. Even if read collectively, it would not be a strained interpretation to apply the word " enumerated," to the classification of powers contained in section 76. It will be observed that the only powers specifically enumerated in the sections preceding 92 are those respecting married women and tenants for life. Sections 81 to 85 do not enumerate powers, but lay down rules as to when certain powers shall take effect as a fee. It cannot for a moment be supposed that this elaborate and comprehensive system was codified, and its machinery put in force, for so slight, narrow, and we had almost said, trivial a purpose. The use of the word' " enumerated " may have been infelicitous and inexact. That it was used in the sense of " mentioned," " indicated," " referred to," " authorized," cannot well be doubted ; that is the true construction. It was the view of Mr. Justice NELSON, when in *Root* v. *Stuyvesant* (18 Wend., 271), he held that this ninety-second section, " neither adds to, nor takes from it, (the article on powers), but in terms declares what must otherwise have been

pronounced by the courts, namely, that a power *inconsistent with the law* is void."

There is no evidence of any intention to detail every particular power admissible under the definitions. No such intention can be gleaned from what is simply an enabling enactment with regard to married women, one which was essential to include the case thus provided for within the definitions. Indeed the definitions necessarily import "enumeration." For instance, section 77, as we have seen, in part defines a general power as one which authorizes the alienation in fee by means of a conveyance to any alienee whatever. To say that a power which is within this definition is not enumerated seems to us unreasonable. It would even be an absurd conclusion to hold that, although the statute declares a power to be general when it authorizes the alienation in fee, etc., yet that *such* alienation in fee under the defined power is not authorized. The *reductio ad absurdum* would be quite as apparent if it were held, that although a general or special power is beneficial under certain defined conditions, yet a grant of such a power in conformity to the conditions is unauthorized.

The respondents may well suggest the possibility of such a view exciting surprise. It is natural that they should look elsewhere for harmony; but the statute, as thus construed, cannot be reconciled by falling back upon the provisions as to general powers in trust. These latter are neither within the definition nor the spirit of the general and beneficial powers. They have an entirely different scope and purpose. The fiduciary or trust character, with regard to the proceeds resulting from the alienation according to the power, pervades them. We need not pursue this branch of the subject further, being satisfied upon the whole that this was a perfectly valid, general and beneficial power.

We now come to the third question. The solution of this question depends entirely upon the effect of the Revised Statutes. Previous thereto, the rule that the exercise of such a power subjected the estate to the claims of creditors was thoroughly well established by a long and unbroken line of decisions in England and in this country. There were occasional protests against the refinement and subtlety of the rule and its lack of logical foundation; but it continued to be the rule. (4 Kent, 339; 2 Sug.

den, § 277; Chance on Powers, § 1817; *Tallmadge* v. *Sill,* 21 Barb., 51; *Johnson* v. *Cushing,* 15 N. H., 313; *Ashfield* v. *Ashfield,* 2 Vern., 287; *Thompson* v. *Towne,* 2 id., 319; *Lassells* v. *Cornwallis,* 2 id., 465; *Hinton* v. *Toye,* 1 Atk., 465; *Jenney* v. *Andrews,* 6 Mad., 264; *Lord Townshend* v. *Windman,* 2 Vesey Sen., 2; *Fleming* v. *Buchanan,* 3 DeG., M. & G., 976; *Vaughan* v. *Vanderstegen,* 2 Drew, 165, 176, 363; *Shattock* v. *Shattock,* L. R., 2 Eq., 187; *Nail* v. *Punter,* 5 Sim., 555.)

The question then is whether the rule has been abrogated by the Revised Statutes. After very careful reflection, we find ourselves drawn to the conclusion that it has been so abrogated, and that the new rules for the protection of creditors, embodied in the article on powers, were intended to be complete, comprehensive *and exclusive.* It is impossible to read the revisers' notes (5 Edmund, 325) without seeing what a radical change in the entire subject was contemplated. This very question of the rights of creditors was specially considered. Old devices by which lands were placed effectually beyond the reach of creditors, and the inadequacy of existing remedies, were pointed out. The particular doctrine now under consideration was referred to as the "single case in which creditors may be relieved." The comment upon this was as follows, page 327: " If a man having a general power of disposition executes it in favor of a purchaser, not for a valuable consideration, and then die, the purchaser is considered in equity a trustee for the creditors ; but, as against the debtor in his life-time, or if he die leaving the power unexecuted as against the owners of land, the creditors are without remedy. 'These distinctions,' Mr. Sugden says, 'may seem refined, but they are well established.' We confess that 'refined' does not seem to us the appropriate word."

Thus it will be perceived that the revisers deemed this rule inadequate, incongruous and, we think we may safely add, absurd; what they proposed in its place were the clear and logical provisions of sections 81 to 85. They prefaced this with the following remark : "That a *change* of the existing law is *here,* not merely proper, but necessary will be admitted by all."

This proposed *change* referred to the rule in question, as well as to the other surrounding incongruities pointed out by the

revisers. They did not desire to treat "a mere power as actual property," for that, they say, "would be a plain violation of legal principles." Nor did they wish to engraft this rule, which had no better foundation than arbitrary judgment necessitated by a different legal system, upon the homogeneous provisions which they had framed with so much care and ability. They even doubted whether a general power to devise, annexed to a previous estate, should be considered an absolute power of disposition. " But there are obvious means," they add, " by which, with the aid of this power, *the tenant for life or years* may acquire, even in his life-time, the entire dominion of the property." (Page 328.)

The result was section 84. But if they doubted, in the particular referred to, they could have had no doubt where the incident of a previous estate was wanting. Under such circumstances dominion could not be exercised over the property. The application of the rents to the use of the donee could no more effect such a purpose than their application to the use of another, and the mere independent exercise of testamentary appointment was evidently not within the mischief sought to be remedied.

It should also be considered that the revisers had before them the protests against this rule to which we have referred. Besides their own quotation from Sugden, they may well have been influenced by the following criticism of Judge STORY, which will be found in note 1 to section 176, page 176, of his Equity Jurisprudence.

" The distinction is a nice one, and not very satisfactory. Why, when the party executes a power in favor of others, and not of himself, a court of equity should defeat his intention, although within the scope of the power, and should execute something beside that intention, and contrary to it, is not very intelligible. If it be said that he ought to be just before he is generous, that addresses itself merely to his sense of morals. The power enabled him to give, either to himself or to his creditors, or to mere voluntary donees. Why should a court of equity restrict this right of election, if *bona fide* exercised ? Is not this to create rights not given by law, rather than to enforce rights secured by law ? If the power was *bona fide* created, why should a court of equity interpose to change its objects or operations ? "

Coming to the act itself, we find that its language is very broad. Section 73 provides as follows: "Powers, as they now exist by law, are abolished; and, from the time this chapter shall be in force, the *creation, construction and execution* of powers shall be governed by the provisions of this article."

Note the language — *creation, construction* and *execution*. Now, the construction of powers necessarily involves the effect to be given to them; that is, the effect throughout, upon all parties, and upon all rights. This view is not controlled by sections 93, 103 and 104. Section 93 has reference to special and beneficial powers; section 103 to the execution of trust powers, and section 104 to beneficial powers, and the interest of persons entitled to compel the execution of trust powers.

Under sections 93 and 103 the powers therein referred to are subjected in equity to the claims of creditors. Under section 104 every beneficial power passes to the assignees of the person in whom such power is vested; but the beneficial power here contemplated is, of course, such as vests some tangible right or interest in the grantee, capable of passing to an assignee, *e. g.*, a general and beneficial power, where the grantee has, by the terms of its creation, an interest in the alienation in fee by means of a conveyance to any alienee whatever. It certainly does not cover a mere option to appoint by will.

But further, while we think that this is a beneficial power within the statutory definition, we very much doubt the applicability of that word in its common and general sense. Indirect possibilities of advantage are not to be treated as legal interests. It is apparent that Mrs. Cutting never intended that her son should reap any individual gain from the exercise of this power.

That is not the just office of an appointment thereunder. It may well be doubted whether equity would specifically enforce any agreement with respect thereto. (See *Blagge* v. *Miles*, 1 Story Cir. Ct. Rep., 445; *Reid* v. *Shergold*, 10 Ves., 370.)

We have not overlooked the cases where specific performance of agreements to devise were decreed. (*Parsell* v. *Stryker*, 41 N. Y., 480; *Johnson* v. *Hubbell*, 5 Am. Law Reg., 177.) These, however, were cases of contracts with respect to one's own property. But a mere authority, a power to appoint by will and not

otherwise, cannot be said to be property, nor the subject of barter and sale.

Here the grantee, Fulton Cutting, was, so to speak, his mother's representative, empowered to do an act which she, to quote section 74, might herself lawfully perform. The grant implied confidence in his judgment, affection, and good faith in the exercise of the authority conferred. Down to his last moment he was to be perfectly free and untrammeled in such exercise of power. Of that freedom he could not, from considerations appertaining to the character of his power and the implications resulting from the quality and surroundings of his mother's grant, be deprived, nor could he relinquish it himself. But this very liberty was limited to the designation, not of one to whom he had obligated himself for a consideration or personal advancement, but of those who should *freely have, receive and enjoy.*

These considerations clearly affected the revisers and the Legislature which acted upon their recommendation. It was evidently considered that the mere isolated power of appointment, annexed to no previous estate, was not that kind of absolute power of disposition which was within the mischief sought to be suppressed.

" There is a moral obligation on every man," the revisers say, " to apply his property to the payment of his debts." But what property ? They furnish the answer. " It is an affront to common sense to say that a man has no property in that which *he may sell when he choose,* and dispose of the proceeds at his pleasure."

It was for that class of cases that they provided the new, and as they believed, all sufficient remedy of turning the absolute power into a fee. We are, therefore, of opinion that the rights of the present appointee are vested, and cannot be questioned at the suit of Fulton Cutting's creditors. These views, however, are only applicable to the real estate. The old rule has not been abrogated as to personalty. The chapter in which powers are included is entitled, " of real property," etc. The whole scheme has reference to lands. The powers which are abolished by section 73, and those which are created by subsequent sections, are powers respecting lands. A power, under section 74, is an authority to do some act in relation to lands.

Powers as to personal property have not been abolished, nor have the provisions respecting land powers been applied thereto. This has been distinctly held with respect to trusts. (*Kane* v. *Gott*, 24 Wend., 661; *Gilman* v. *Reddington*, 24 N. Y., 12; *Cruger* v. *Cruger*, 5 Barb., 239.) Yet the language is there the same : " uses and trusts, except as authorized and modified in this article are abolished." The analogy is complete.

In *Gilman* v. *Reddington* (*ubi supra*), COMSTOCK, J., remarked that " trusts in personal estate are subject to no statutory restriction ; in other words, the Legislature has never attempted to define and enumerate the lawful occasions for creating such trusts. They stand, therefore, as at common law, subject only to the statutory rule against the suspension of ownership for more than two lives."

Powers are not limitations of future or contingent interests in lands. But, even if they were, the only effect would be to subject personalty powers to the rules in relation to *future* estates in lands. (1 R. S., 773, § 2.)

The inalienabilily of the rents and profits during Fulton Cutting's life has no bearing on this question. The old rule did not proceed upon considerations of the alienability of rents and profits. The case, as to personalty, stands as it did before the Revised Statutes. We feel bound, with due respect to the doctrine of *stare decisis*, and in view of the overwhelming weight of authority to which we have called attention, to hold that as to the personalty the creditors are let in.

The judgment must therefore be modified, so as to limit the plaintiffs lien to, and his right to payment from, that part of the principal of the share in question which consisted of personal property, without costs of this appeal.

DAVIS, P. J., concurred.

BRADY, J. (dissenting).

I have not time at present to express my views of the rights of creditors arising from the due execution of a power, such as granted by Mrs. Cutting, and must content myself by simply observing that the Revised Statutes do not, in my opinion, contain any provisions designed to abrogate the law on that subject, as it existed

in regard to real estate when a valid power was created and exercised. And, further, that I do not discover from the revisers' notes any intention to interfere with the results of such a power and its exercise. What is said by them is not as clearly enunciated as it might be, a peculiarity which generally seems to mark the mystic subject of powers and trusts where treated ; but the whole expression of the revisers, in regard to the matter, leads my mind to the conclusion that they meant to secure the existing rights of creditors more effectually. I therefore dissent from so much of the judgment pronounced by my brethren as conflicts with this opinion.

Judgment modified as directed in opinion of BARRETT, J.